UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    -against-

JULIO VALLEJO

    Defendant

11 CR 869 (PGG)

---

**SENTENCING MEMORANDUM
FOR JULIO VALLEJO**

    Deborah Colson
    COLSON & HARRIS LLP
    10 E. 40th Street, Suite 3307
    New York, New York 10016
    (212) 257-6455

    *Attorney for Julio Vallejo*

Dated:   New York, New York
            August 23, 2012

I.

## Introduction

Mr. Vallejo pled guilty on May 3, 2012, to participating in a conspiracy to commit robbery. He is scheduled to be sentenced on September 6, 2012. The Probation Department estimates an advisory Guidelines range of 27 to 33 months based on a total offense level of 16 and a criminal history category of III. I write to request that the sentence in this case be imposed to run concurrently with an undischarged term of imprisonment imposed by Judge Daniels in a cocaine conspiracy case in 2009. In the alternative, I request a significant downward variance from the Guidelines range.

A consecutive Guidelines sentence is significantly "greater than necessary to comply with the purposes" of sentencing articulated in 18 U.S.C. § 3553(a). Nor would it be an efficient use of government resources. Mr. Vallejo played a minor role in the instant offense; he was not present for the attempted robbery, nor was he privy to the specific details of his co-defendants' plan. In addition, but for a single infraction, he has had a clean disciplinary record over six years inside the BOP. He is not due to be released on the narcotics case until February 13, 2017, following which he will be deported to the Dominican Republic. Though all five of his children live in the United States, his re-entry will be prohibited.

Attached in support of this application are letters from Mr. Vallejo's brother, David Vallejo; his sister-in-law, Daisy Vallejo; and his mother, Mayra Vallejo. (Ex. A).

II.

## Mr. Vallejo's Personal History and Characteristics

Mr. Vallejo (age 41) was born and raised with seven siblings in a family of modest means in Santo Domingo, Dominican Republic. (PSR at ¶ 59). His father, who passed away in 2009,

1

was a police officer, and his mother worked for the local public schools. (*Id.*). Though his family never lacked for food or other essentials, they struggled to make ends meet.

By necessity, Mr. Vallejo went to work at a young age. When he was ten, he found a job as a mechanic's helper at a local auto body shop in Santo Domingo. Over the years, he gradually learned the trade, and by the time he reached high school, he was spending at least several hours at the shop each day. He left school at age seventeen to work full-time, and immigrated to the United States two years later for a position as a mechanic at his uncle's auto repair business in the Bronx. He was awarded a green card in 1995. (PSR at ¶ 61).

Mr. Vallejo speaks little English and, once in New York, he never returned to school. Despite these disadvantages, he has a lengthy history of employment in the United States. He worked with his uncle for more than a decade, until moving to New Bedford, Massachusetts in 2000. (PSR at ¶ 75). In Massachusetts, he became a licensed asbestos remover and found a job for a company in New Bedford called Franklin Analytical Service. (*Id.* at ¶ 74). He left Franklin Analytical in 2002 when the company's business slowed.

Mr. Vallejo has five children, ranging in age from ten to nineteen. His three eldest live with their mother, Leonilda Lara, in Boston, Massachusetts. (PSR at ¶ 64). His two younger children live with their mother, Elvira Rivera, in Providence, Rhode Island. (*Id.*). All five are American citizens. Prior to his arrest in 2006, Mr. Vallejo played an active role in his children's lives. He still maintains positive relationships with each of them and relishes their visits with him at the MDC.

In the attached letters, Mr. Vallejo's family members describe him as an optimistic person with a good heart, and they write that he has matured during his time in prison. "He understands that the errors he has made not only affect him, but all of the people who love and

care for him," writes his brother, David. (Ex. A). "He realizes that he has missed many important occasions with his family; birthdays, Christmases and other important events due to his mistakes." (*Id.*). Most devastating for Mr. Vallejo was his absence in 2009 during his father's illness and eventual death. Mr. Vallejo continues to experience enormous frustration and guilt over his inability to attend the funeral. He continually tells his siblings "what a hard time he has been going through being way from home, and he has learned that his family will be his priority from now on." (*Id.*). Mr. Vallejo recognizes he will be deported when his sentence is complete, but he is committed to maintaining regular contact with his family in New York and to receiving visits from his children.

### III.

### The Nature and Circumstances of the Offense

The charges in this case originate from an ATF sting operation. In August 2011, an ATF agent, posing as a disgruntled drug courier, met with Mr. Vallejo's uncle, Gaspar Vallejo Sr., to discuss the robbery of a fictitious drug source. (PSR at ¶ 15). Gaspar agreed and recruited four others to participate, including two of his sons. During recorded meetings and calls in August and early September 2001, Gaspar and the undercover formulated a plan. (*Id.* at ¶¶ 17-19). On September 19, several members of Gaspar's robbery team met with the undercover at a McDonald's parking lot in the Bronx with the intention of committing the robbery that afternoon. (*Id.* at ¶ 23). From there, they followed the undercover to a storage facility where he falsely claimed to have parked an additional car with a trap for transporting drugs. (*Id.* at ¶ 24).

Despite what the defendants were led to believe, there was nothing real to be stolen and no real victims from whom to steal. Instead, multiple government agents were stationed in and

around the storage facility waiting to execute an arrest. The defendants were arrested in their car following a shoot out with the agents during which two defendants were hit. (*Id.* at ¶¶ 24-25).

Mr. Vallejo did not participate in the planning meetings with the undercover, nor was he present for the attempted robbery on September 19. In fact, he has been incarcerated on the narcotics case since September 2006. In August and September 2011, he was housed at FCI Fort Dix. Mr. Vallejo's sole involvement in the conspiracy was to connect the undercover with his uncle, Gaspar. Mr. Vallejo had several brief phone conversations with the undercover from Fort Dix, during which he provided the undercover with Gaspar's contact information and suggested that they meet. He also gave Gaspar the undercover's phone number. Thereafter, the two men communicated with one another directly.

Mr. Vallejo did not initiate contact with the undercover. (PSR at ¶ 36). He was introduced to the undercover by his cellmate, Fernando Esmurria, who appears to have been working as a government informant. (*Id.* at ¶ 30). Esmurria arranged the calls with the undercover and encouraged Mr. Vallejo to participate under the pretense that he and the undercover were cousins. During the calls, Esmurria typically updated the undercover for several minutes before handing the phone to Mr. Vallejo. Esmurria has not been criminally charged, and the government has not disclosed whether he received any benefit or reward for his assistance. Whatever his role in the offense, he is reaching the end of his sentence on a prior case and is due to be released from prison in October 2012.

Importantly, Mr. Vallejo lacked both knowledge and control over the events that unfolded on September 19. There is no evidence that he knew when the robbery had been scheduled or even whether a date certain had been selected. Nor can the government establish that Mr. Vallejo was privy to the specifics of the plan, including that non-family members had

4

been recruited to participate and that firearms would be used.  Mr. Vallejo's last phone call with the undercover took place more than ten days before the robbery attempt, and no specifics were discussed.  Safety was Mr. Vallejo's primary concern and, had he been told about the firearms, he likely would have disapproved.  In a call with the undercover on August 31, 2011, Mr. Vallejo stated: "Oh, *okay,* [U/I] what I want is whatever you all do, do it safely so that there's no problems….Because I'm here in prison, and I know how dirty this system is."

The government also lacks evidence that Mr. Vallejo expected or negotiated for compensation.  In late August 2011, the undercover asked Mr. Vallejo whether Gaspar was "going to take care" of him, then never mentioned money again.  Nor is there evidence that Mr. Vallejo ever bothered to follow up regarding payment with Gaspar.

In short, although Mr. Vallejo provided the link between Gaspar and the undercover, he did not initiate the interaction, and his involvement ended there.  He lacked knowledge and control over subsequent events and did not have a stake in the profits.

**IV.**

**A Concurrent or Non-Guidelines Sentence are Both Sufficient to Satisfy the Sentencing Goals of § 3553(a)**

Pursuant to 18 U.S.C. § 3584(a), this Court has the discretion to impose the instant sentence to run concurrently with Mr. Vallejo's undischarged term of imprisonment on the narcotics case.  *See* 18 U.S.C. § 3584(a) ("…[I]f a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively").  Although the Sentencing Guidelines discourage concurrent sentences for crimes committed in prison, *see* U.S.S.G. § 5G1.3(a), since the Guidelines are advisory, the Court is not obligated to follow them.

The analysis required in deciding whether to impose a concurrent sentence is identical to that used for determining whether to vary from the Guidelines range.  In both cases, the Court is tasked with considering the sentencing factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3584(b) ("The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider…the factors set forth in section 3553(a)").

Section 3553(a) of title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a).  This obligation, known as the "parsimony clause," applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a).  Indeed, the command of the parsimony clause defines the Court's "overarching duty." *Pepper v. United States*, 131 S.Ct. 1229, 1243 (2011).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper,* 131 S.Ct. at 1240 (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)).  While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 128 S.Ct. 586, 596-97 (2007).  Rather,

6

the judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 597. The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008).

Here, several factors warrant a concurrent and/or reduced sentence. First, Mr. Vallejo's involvement was minimal. *See supra* Section III. In recognition of his limited culpability, the government has awarded him a two-level minor role reduction. (PSR at ¶ 7). However, even with that reduction, the Guidelines are still "greater than necessary" to reflect Mr. Vallejo's lack of initiation, knowledge, or control.

Second, but for one minor infraction five years ago, Mr. Vallejo has a clean disciplinary record inside the BOP. In 2007, Mr. Vallejo permitted another inmate to use his pin number to make a phone call. (PSR at ¶ 8). When confronted with his misdeed, he immediately admitted his wrongdoing and declined the opportunity to contest the allegations against him at a hearing. His phone privileges were suspended for four months, but he remained in the general population. Since then, Mr. Vallejo has not had any additional disciplinary violations.

Third, it would be a waste of public funds and correctional resources to impose a lengthy consecutive sentence. *See United States v. Nigg,* 10-Cr-273, 2011 WL 5358687 at *9 (E.D.Wis. May 5,2011) (noting that excessive sentences "waste public funds and correctional resources"). The most recent statistics released by the BOP reflect an average cost of $26,094 per prisoner per year. *See* Federal Prison System Per Capita Costs FYI 2011 at http://www.bop.gov/foia/fy11_per_capita_costs.pdf . Thus, sentencing Mr. Vallejo to an additional 27 months in prison would cost approximately $58,711. Mr. Vallejo received a sentence of 144 months before Judge Daniels—five years more than the lead defendant in that

case and approximately 100 months more than any of the other defendants. He still has nearly four and a half years left to serve and will be deported upon his release, reducing his risk of recidivism in the United States. Extending his sentence another two years would unnecessarily burden American taxpayers without any obvious, additional deterrent effect. *See United States v. Marsh,* 10-Cr-480, 2011 WL 5325410 at *1 (E.D.N.Y. Oct. 26, 2011) (imposing reduced sentences in securities fraud case in part to reduce cost to taxpayers). *See also U.S. v. Prosperi,* 10-Cr-1739, 2012 WL 2866243 at *15 (1st Cir. July 13, 2012) (affirming district court's sentence where judge weighed the benefits versus the costs of incarceration); *United States v. Trancheff,* 633 F.3d 696, 698 (8th Cir. Feb. 2011) (Bright, J., concurring) (criticizing fifteen year sentence in drug case for defendant who will be deported and writing that "we ought to deport Trancheff [the defendant] immediately rather than have taxpayers feed, clothe, and shelter" him for fifteen years); *United States v. Merced,* 603 F.3d 203, 221 (3rd Cir. Apr. 2010) (recognizing cost of imprisonment argument as potentially legitimate policy disagreement with career offender guideline).

      Fourth, Mr. Vallejo is likely to suffer the consequences of his actions within the prison system. His security level will probably be increased because of the instant conviction, meaning he may be designated to a more restrictive correctional facility. He is also at risk of losing good time. It bears noting that, because Mr. Vallejo was brought to the MDC on a writ, he has not earned any time off his sentence in this case. Moreover, following the completion of his sentence, he will serve additional time in immigration custody awaiting certain deportation.

      Finally, Mr. Vallejo's children will suffer if he is sentenced to additional time in prison. Though they visit him on occasion, Mr. Vallejo has not spent any significant time with any of his family members since 2006. Mr. Vallejo reports that children's grades have dropped over the

last several years, and they have increasingly acted out at home. An extension of his sentence will come at great personal cost to his children with little, if any, additional deterrent effect.

## V.

## CONCLUSION

For the above reasons, we respectfully request that the Court impose a concurrent and/or significantly reduced sentence here.

Dated:     New York, N.Y.
           August 23, 2012

                                        /s/
                                        _____
                                        Deborah Colson
                                        Colson & Harris LLP
                                        10 E. 40th Street, #3307
                                        New York, N. Y. 10016
                                        (212) 257-6455